## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ──────────────────────────── : | |
| MAXEON AMERICAS, INC. : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Case No. 25-cv-00074 |
| : | |
| UNITED STATES OF AMERICA, acting : | |
| through U.S. Customs and Border Protection : | |
| : | |
| Defendant. : | |
| ──────────────────────────── : | |

## COMPLAINT

Plaintiff Maxeon Americas, Inc. ("Plaintiff" or "Maxeon"), by and through undersigned

counsel, alleges as follows:

## INTRODUCTION

1. This case is about government overreach and lack of due process by U.S. Customs and

   Border Protection ("CBP") in its erroneous exclusion of Maxeon's 750 Max6 model solar

   modules in Entry Number 218-5008868-9 (the "Solar Modules"). CBP incorrectly

   applied the Uyghur Forced Labor Prevention Act, Pub. L. No. 117-78, 135 Stat. 1525

   (2021) ("UFLPA" or the "Act"), which establishes a rebuttable presumption that goods

   made in China's Xinjiang Uyghur Autonomous Region ("Xinjiang") or by a company on

   the UFLPA Entity List were made with forced labor and are therefore excludable under

   19 U.S.C. § 1307. Thus, the issue in this case is whether the Solar Modules were made, in

   whole or in part, in Xinjiang or by a company on the UFLPA Entity List. They were

   not—and CBP has never alleged otherwise. As extensive documentation demonstrated,

the Solar Modules were manufactured in Mexico and their polysilicon supply chain is in no way linked to a company in Xinjiang or on the UFLPA Entity List.

2. CBP detained and subsequently excluded the Solar Modules in apparent reliance on the UFLPA presumption, even though it does not apply because the goods have no connection to Xinjiang or to a company on the UFLPA Entity List in the first place. In response to the detention, Maxeon submitted hundreds of documents and conducted multiple presentations that convincingly demonstrated that fact. CBP inexplicably denied Maxeon's protest and excluded the entry, offering only a generic and arbitrary conclusion that the documentation submitted by Maxeon was supposedly insufficient. CBP disregarded the substantial and persuasive information that Maxeon presented and appears to be applying an unreasonably difficult standard and an arbitrary authority that is not articulated or permitted by the UFLPA.

3. While the UFLPA imposes a clear and convincing evidentiary standard when a product is made in Xinjiang, or by a company on the UFLPA Entity List, those circumstances are not present in this case. In addition, CBP's published guidance states that this heightened evidentiary standard does not apply when demonstrating that the manufacture of the product did not involve Xinjiang or a company on the UFLPA Entity List. CBP's improper efforts to rewrite the UFLPA should be rejected.

4. In the end, the Solar Modules were not made in Xinjiang or by a company on the UFLPA Entity List or with forced labor and the evidence Maxeon already submitted to CBP is more than sufficient to carry Maxeon's burden on that point.

## JURISDICTION & STANDING

5.   This Court has exclusive subject matter jurisdiction of this action pursuant to 28 U.S.C.

§ 1581(a).

6.   Maxeon has standing under 28 U.S.C. § 2631 to commence and prosecute this civil

action contesting CBP's denial of Maxeon's protest under section 515 of the Tariff Act of

1930 (19 U.S.C. § 1515).

## PARTIES

7.   Plaintiff is Maxeon Americas, Inc. ("Maxeon"), a corporation formed under the laws of

Delaware in 2020 and having its principal place of business in San Jose, California.

Maxeon is engaged in the importation of solar modules (which are manufactured by a

Maxeon affiliate) for sale in the United States. Maxeon is an Importer of Record, with

IOR Number 86-312784700. Maxeon is also a CBP Trusted Trader as a member of the

Customs-Trade Partnership Against Terrorism (C-TPAT) program.

8.   Defendant is U.S. Customs and Border Protection ("CBP"), which is a component of the

U.S. Department of Homeland Security. CBP is the federal agency charged with making

admissibility determinations under 19 U.S.C. § 1595a.

## TIMELINESS OF THIS ACTION

9.   Where, as here, jurisdiction vests under 28 U.S.C. § 1581(a), a plaintiff must file an

action within 180 days after CBP denies a protest submitted by the plaintiff.

10.  On September 26, 2024, Maxeon timely submitted Protest Number 250624100757 (the

"Protest"), challenging CBP's exclusion of the 750 Solar Modules in Entry Number 218-

5008868-9 pursuant to the UFLPA.

11.  On March 26, 2025, CBP denied the Protest.

12. Maxeon filed a Summons relating to the Protest on April 21, 2025.

13. Maxeon filed that Summons within 180 days of the date of denial by CBP of Maxeon's Protest.

14. Maxeon filed its Complaint within twenty-four months of filing the Summons and placement on the Customs Case Management Calendar, pursuant to Rule 83 of this Court.

15. Accordingly, this Complaint is timely filed.

## LEGAL BACKGROUND

16. Merchandise is not entitled to entry into the United States if it is "mined, produced, or manufactured wholly or in part in any foreign country by convict labor or/and forced labor or/and indentured labor under penal sanctions." 19 U.S.C. § 1307.

17. The UFLPA applies a rebuttable presumption that "any goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part in the Xinjiang Uyghur Autonomous Region of the People's Republic of China or produced by an entity on [the UFLPA Entity List]"[1] are prohibited from importation under 19 U.S.C. § 1307, and as such, may not be entered into the United States. UFLPA Sec. 3(a).

---

[1] The UFLPA requires the U.S. Forced Labor Enforcement Task Force to maintain:

    (i)       a list of entities in the Xinjiang Uyghur Autonomous Region that mine, produce, or manufacture wholly or in part any goods, wares, articles and merchandise with forced labor;

    (ii)     a list of entities working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region;

    (iii)    a list of entities that exported any products mined, produced, or manufactured by any entity on the preceding two lists from the People's Republic of China into the United States; and

18. In turn, the UFLPA requires an importer to show by clear and convincing evidence that goods were not made with forced labor *only if* goods were made in China's Xinjiang region or by a company on the UFLPA Entity List. But the law does not require that level of proof to show that goods were not made in Xinjiang or by a company on the UFLPA Entity List in the first place. UFLPA Sec. 3(b). CBP's online guidance explicitly states that "[t]he UFLPA's clear-and-convincing standard does not apply to [a] showing" that the "importation is outside the scope of the UFLPA."[2]

## STATEMENT OF FACTS

### Exclusion & Protest

19. Maxeon imported the Solar Modules, described below, into the United States at the Port of Otay Mesa, California, under Entry Number 218-5008868-9, on or around July 9, 2024.

---

(iv)     a list of facilities and entities, including the Xinjiang Production and Construction Corps, that source material from the Xinjiang Uyghur Autonomous Region or from persons working with the government of the Xinjiang Uyghur Autonomous Region or the Xinjiang Production and Construction Corps for purposes of the "poverty alleviation" program or the "pairing-assistance" program or any other government labor scheme that uses forced labor.

UFLPA § 2(d)(2)(B)(i)–(v), (e)(2). This list is referred to as the "UFLPA Entity List." *See also UFLPA Entity List*, U.S. Dep't of Homeland Sec. (Jan. 14, 2025), https://www.dhs.gov/uflpa-entity-list.

[2] *See UFLPA Frequently Asked Questions*, U.S. Dep't of Homeland Sec. (May 1, 2025), https://www.dhs.gov/uflpa-frequently-asked-questions ("If CBP has taken an enforcement action under the UFLPA, however, and the importer believes that its importation is outside the scope of the UFLPA, an importer may provide information to CBP to that effect, i.e., information showing that the imported goods and their inputs are sourced from outside Xinjiang and have no connection to entities on the UFLPA Entity List. The UFLPA's clear-and-convincing standard does not apply to this showing.").

20. CBP issued a Notice of Detention related to Entry Number 218-5008868-9 on or around July 10, 2024, citing the UFLPA. *See* Exhibit A, Detention Notice Number 1720631301122.

21. The detention was assigned to CBP's Electronics Center of Excellence and Expertise (the "CEE") for review.

22. Maxeon immediately engaged with the CEE to understand the basis for the detention. The CEE did not provide Maxeon with information regarding any forced-labor suspicion by the agency but instead referred Maxeon to the Notice of Detention's UFLPA Attachment, which provides the type of traceability records that CBP suggests could be submitted in response to a UFLPA detention. *See* Ex. A.

23. The Solar Modules consist of 750 of Maxeon's Max6 model residential solar modules. Each Solar Module has a unique serial number.

24. After engagement with the CEE, Maxeon and the CEE determined that Maxeon would trace the supply chain for one representative module with Serial Number U27M30161364 (the "Sample Module") from completed module back to quartz (the raw material) to demonstrate that the supply chain of the Solar Modules does not include an entity located in Xinjiang or named on the UFLPA Entity List, meaning that the Solar Modules are not subject to the UFLPA's rebuttable presumption of forced labor.

25. Within thirty days of receiving the detention notice, Maxeon began submitting documents to the CEE to demonstrate that the UFLPA did not apply to the Solar Modules because neither the Solar Modules nor the polysilicon-based components were produced in Xinjiang or by an entity on the UFLPA Entity List (referred to herein as an "applicability petition").

26. Over the course of approximately two months, Maxeon submitted several rounds of documents that the CEE requested in an effort to cooperate and work collaboratively with the CEE to evidence the integrity of the Max6 supply chain. During that time, Maxeon provided hundreds of records, ranging from purchase records to production records to employment records.

27. Maxeon made substantial efforts to procure the documents that the CEE demanded, even when the requested records were irrelevant to or outside the scope of an applicability petition, such as employment records for Maxeon's supplier located in Taiwan.[3]

28. Despite Maxeon's efforts, CBP excluded the Solar Modules on or about September 9, 2024. *See* Exhibit B, Exclusion Letter from the Port of Otay Mesa to Maxeon (Sept. 9, 2024). Maxeon received the notice of exclusion via email on September 17, 2024.

29. According to the exclusion letter, CBP excluded the Solar Modules because Maxeon "failed to request an exception or to provide evidence to demonstrate the merchandise was not produced in whole or in part in the Xinjiang Uyghur Autonomous Region or by an entity on the UFLPA Entity List within 30 days from which the cargo was detained." *See* Ex. B. Maxeon immediately and consistently engaged with the CEE in an effort to satisfy the CEE's documentation expectations, even when such expectations were unreasonable.

30. Following this exclusion, Maxeon indicated to the CEE that it would protest the exclusion. On or about September 23, 2024, the CEE review team requested that Maxeon

---

[3] Employment records might be relevant to a petition to overcome the rebuttable presumption of forced labor once a supplier is identified as being located in Xinjiang or named on the UFLPA Entity List. But since there is no such supplier in the Max6 supply chain and the UFLPA's rebuttable presumption does not apply, employment records were irrelevant to the CEE's consideration of Maxeon's applicability petition.

trace all 750 Solar Modules in the entry instead of tracing only the one Sample Module. Maxeon complied with this request and submitted the additional records in connection with its protest.

31. Maxeon timely protested the exclusion of the Solar Modules on September 26, 2024, under Protest Number 250624100757 (the "Protest"). The Protest was submitted via ACE pursuant to 19 U.S.C. § 1514 and 19 C.F.R. 174.24(b) & 174.25, which permits further review of a protest that would otherwise be denied by the CEE. In its Protest, Maxeon again argued that the UFLPA's rebuttable presumption did not apply to the Solar Modules and included documentation supporting that assertion.

32. The Protest included a thirty-nine-page narrative that explained how the supporting documentation traces the Sample Module's supply chain to the raw materials and demonstrates that the Sample Module's supply chain does not involve a company located in Xinjiang or included on the UFLPA Entity List. In addition, Maxeon submitted the corresponding supply chain records for all 750 Solar Modules. In total, one hundred and sixty exhibits were originally submitted in support of the Protest. The original supporting documentation included invoices, purchase orders, proofs of payment, certifications of origin, and shipping records relating to the Solar Modules and their polysilicon-based components.

33. Maxeon supplemented the Protest on September 27, 2024 with additional payment records, including nine new exhibits.

**Supply Chain of the Solar Modules**

34. As is typical when tracing solar modules for UFLPA applicability, and upon agreement with the CEE, the Protest focused on the Solar Modules' polysilicon supply chain and did

not cover the non-polysilicon-based components, such as the glass, frame, or electrical components of the completed solar modules.[4] In its communications with Maxeon and its counsel, CBP has never contended that the UFLPA applied to any non-polysilicon-based components in the Solar Modules. In any event, the non-polysilicon-based components of the Solar Modules similarly were not sourced from an entity located in Xinjiang or named on the ULFPA Entity List.

35. In its Protest, Maxeon demonstrated that the polysilicon supply chain for the Solar Modules does not involve an entity that is located in Xinjiang or named on the UFLPA Entity List.

36. In fact, the Solar Modules' polysilicon supply chain is entirely outside China—an important fact that CBP seems to have ignored in excluding the Solar Modules.

37. As documented in the Protest and supporting supply chain records, a summary of the Max6 polysilicon supply chain is as follows:

---

[4] CBP has published UFLPA guidance, including a "Sample Table of Contents for Solar Panels," which focuses exclusively on the polysilicon elements of a solar module supply chain. *See* U.S. Customs & Border Protection, Office of Trade, *Guidance on Executive Summaries and Sample Tables of Contents: Preparing a UFLPA Applicability Review Submission*, CBP Pub. No. 3082-0223, 2-3 (available at https://www.cbp.gov/sites/default/files/assets/documents/2024-Feb/Forced_Labor_Guidance_on_Executive_Summaries_and_Sample_Tables_of_Contents_0.pdf). This guidance outlines the "documents that typically facilitate CBP's review and should be included in importer submissions." *Id.* With regard to solar modules, the guidance suggests that an importer produce transaction, transportation, production, and inventory records for the solar modules, solar cells, wafers, ingots, polysilicon, metallurgical-grade silicon, and quartzite. *Id*. As noted in paragraph 38 below, Maxeon produced supply chain records in each of these categories.



a. **Solar Modules:** Max6 solar modules, including the Solar Modules at issue, are produced at SunPower Corporation México, S. de R.L. de C.V ("SunPower Mexico") in Ensenada, Mexico. SunPower Mexico is wholly-owned by Maxeon Solar Technologies, Ltd. ("Maxeon Parent"), the ultimate parent company of Plaintiff Maxeon. The Solar Modules were produced using solar cells purchased from SunPower Malaysia Manufacturing Sdn. Bhd. ("SunPower Malaysia") in Malacca, Malaysia. SunPower Malaysia is also wholly-owned by Maxeon Parent.

   i. Due to maquiladora regulations in Mexico, SunPower Systems Sarl ("SunPower Switzerland"), which is a Swiss entity wholly-owned by Maxeon Parent, holds title to the materials used to manufacture the solar modules. Therefore, SunPower Switzerland issues the commercial invoice to Maxeon for the purchase of the finished modules, but SunPower Switzerland does not take physical custody of the solar cells or modules and does not play a role in actual manufacturing.

b. **Solar Cells:** Solar cells absorb and convert the energy from sunlight into electrical energy. SunPower Malaysia manufactured the solar cells that were used in the Solar Modules at its factory in Malacca, Malaysia. The cells, which are

unique to the Max6 model, were manufactured in Malaysia using wafers procured from AUO Crystal Corporation ("AUO").

      i.   Maxeon Solar Pte. Ltd. ("Maxeon Singapore"), which is the sole shareholder of Plaintiff Maxeon and is a wholly-owned subsidiary of the Maxeon Parent, serves as a financial intermediary in this transaction. Maxeon Singapore purchases the solar cells from SunPower Malaysia and directs shipment to SunPower Mexico. Maxeon Singapore does not take physical custody of the solar cells and does not play a role in actual manufacturing.

      ii.  As noted above, due to maquiladora regulations in Mexico, SunPower Switzerland holds title to the materials used to manufacture the solar modules. Therefore, Maxeon Singapore subsequently sells the solar cells to SunPower Switzerland, which directs shipment to SunPower Mexico. SunPower Switzerland does not take physical custody of the solar cells and does not play a role in actual manufacturing.

c.  **Wafers:** Solar wafers are thin slices of crystalline polysilicon. The wafers that were used in the Solar Modules were sliced from ingots by AUO at its factory in Taichung City, Taiwan. The wafers were manufactured in Taiwan using ingots produced at the same factory.

d.  **Ingots:** In the solar context, ingots are large blocks of crystalline polysilicon. The ingots that were used in the Solar Modules were produced at AUO's factory in Taichung City, Taiwan. The ingots were manufactured in Taiwan using polysilicon from Hemlock Semiconductor LLC ("Hemlock Semiconductor").

11

e. **Polysilicon:** Solar-grade polysilicon is a highly purified form of silicon that facilitates the conversion of sunlight to electricity. The polysilicon that was used to produce the Solar Modules was manufactured in the United States by Hemlock Semiconductor at its factory in Hemlock, Michigan. Only polysilicon manufactured by Hemlock Semiconductor in the United States was used to make the ingots and wafers used to produce the Solar Modules. In fact, AUO is contractually obligated by Maxeon to produce ingots and wafers using only polysilicon from Hemlock Semiconductor in the United States.

    i. Similar to the solar cell transactions described above, Maxeon Singapore also serves as a financial intermediary in the polysilicon transaction. Maxeon Singapore purchases the polysilicon from Hemlock Semiconductor and directs shipment to AUO. Maxeon Singapore does not take physical custody of the polysilicon and does not play a role in actual manufacturing.

f. **Metallurgical-Grade Silicon and Quartz:** Silica, the mineral required to produce polysilicon, is commonly found in quartz. Once mined, the quartz is processed into metallurgical-grade silicon ("MGS"). Dow Silicones Corporation ("Dow"), located in Auburn, Michigan, supplied Hemlock Semiconductor with the MGS, trichlorosilane ("TCS"), and quartz that were used to produce the polysilicon in the Solar Modules. The MGS was procured from suppliers located in the United States, Brazil, and Canada. The TCS was procured from a supplier located in Auburn, Michigan. Upon information and belief, supply chain records related to the procurement and mining of quartz were supplied directly to CBP by

Dow, as is common practice, and none of the quartz used in the Solar Modules was mined by an entity located in Xinjiang or named on the UFLPA Entity List.[5]

38. Maxeon submitted the following types of records, covering each component in the Solar Modules' polysilicon-based supply chain and providing additional information regarding the suppliers and financial intermediaries involved in the supply chain. This compilation of records exceeds what is required to demonstrate that the supply chain is located outside Xinjiang and does not include an entity on the UFLPA Entity List.

| Supply Chain Tracing | |
|---|---|
| General | Supply Chain and Traceability Summary<br>Supply Chain and Packaging Overview<br>Chief Legal Officer's Declaration |
| Solar Modules | Export Invoice<br>Entry Summary<br>Module Commercial Invoice<br>Module Packing List<br>Module Manufacturing Data<br>Module Flash Test Data |
| Solar Cells | Solar Cells Bills of Lading<br>Solar Cells Commercial Invoices<br>Solar Cells Packing Lists<br>Solar Cells Proofs of Payment<br>Solar Cells Manufacturing Data<br>Explanation of Solar Cells Sizes |
| Wafers | Wafer Commercial Invoices<br>Wafer Bills of Lading<br>Wafer Packing Lists<br>Wafer Purchase Orders |

---

[5] Maxeon has no reason to believe, and CBP has never suggested, that the quartz used in the Solar Modules was procured from an entity located in Xinjiang or listed on the UFLPA Entity List. Hemlock Semiconductor has committed publicly to only using quartz mined in North or South America. *See* Exhibit C, Hemlock 2024 Sustainability Report 42, https://www.hscpoly.com/wp-content/uploads/2024/11/2024-Sustainability-Report.pdf ("Materials from ethical and traceable suppliers are critical to the production of our hyper-pure polysilicon. In line with our long-standing commitment to resilient and environmentally sustainable supply chains, HSC sources all MG-Si from suppliers that use quartz mined from North and South American sources.").

|  | Wafer Proofs of Payment<br>Wafer Certificates of Origin<br>Wafer Production Capacity Report<br>Ingot & Wafer Production Overview |
| Ingots | Ingot to Wafer Manufacturing Data and Tracing Report<br>Ingot Production Capacity Report<br>Ingot & Wafer Production Overview |
| Polysilicon | Polysilicon Commercial Invoices<br>Polysilicon Purchase Orders<br>Polysilicon Proofs of Payment<br>Polysilicon Bills of Lading<br>Polysilicon Shipment Confirmations<br>Polysilicon Certificates of Analysis<br>Polysilicon Certificates of Origin |
| Metallurgical-Grade Silicon | *Documents provided directly to CBP by Dow* |
| **Corporate Records** ||
| Plaintiff Maxeon | Modern Slavery Statements 2021 – 2023<br>Code of Ethics and Business Conduct<br>Conflict Minerals Policy<br>Human Rights Policy<br>Supplier Sustainability Guidelines<br>Whistleblower Policy<br>Corporate Statement of Information |
| Maxeon Affiliates | Maxeon Parent Corporate Structure and ESG Presentation<br>SunPower Mexico Corporate Tax Identification<br>SunPower Malaysia Certificate of Incorporation |
| AUO | Corporate Overview<br>ISO Certifications<br>Summary of ESG Policies<br>Employee Timecard Data |

39. As explained above and demonstrated in the Protest and the supply chain records submitted to CBP, neither the Solar Modules nor their polysilicon-based components were produced by an entity located in Xinjiang or named on the UFLPA Entity List. The Solar Modules' polysilicon supply chain does not involve China at all.

**Protest Review & Denial**

40. On October 1, 2024, Maxeon and its counsel met with the CEE via video conference to provide an overview of the documentation submitted with the Protest and to answer any questions.

41. On October 8, 2024, approximately twelve days after the Protest was submitted, the CEE suspended the Protest and sent the Protest to CBP's Office of Regulations & Rulings ("OR&R") for further review. Despite Maxeon's clear efforts to engage with the CEE on this issue, the CEE did not specify its concerns in any meaningful level of detail. Instead, the CEE included the following, unclear paragraph in its message to Maxeon via ACE when the Protest was sent for further review:

> The additional wafers do not have inventory reports to support the supply chain origination, only unverified screenshots. The protest shows the match of wafer/cell count with no breakage/waste documented; a large amount of inventory previously not referenced to complete the modules leading to inconsistencies with documentation and traceability. The SunPower relationship disclosed with the added Swiss supply chain entity at protest changed the corporate structure and supply chain from the previous submission.

42. The concerns cited by CBP left Maxeon with little understanding of why the UFLPA was supposedly implicated by its supply chain. Indeed, at no point has CBP indicated that the Solar Modules' supply chain includes an entity located in Xinjiang or included on the UFLPA Entity List.

43. Furthermore, the concerns expressed by the CEE on October 8, 2024, are without merit, and in fact, are contradicted by the records that Maxeon submitted in its Protest:

   a. The CEE claimed that "[t]he additional wafers do not have inventory reports to support the supply chain origination, only unverified screenshots." This allegation has no merit—and does not even make sense—because Maxeon submitted data

extracts that, at a batch level, connect the cell boxes to the wafer cartons, and in turn, the wafer cartons to the Ingot IDs. The screenshots provided, which were taken from the relevant internal supplier systems (e.g. SAP and ERP platforms) corroborate the data extracts by showing the native source of the data. In other words, the screenshots Maxeon provided reflect inventory records.

b.  The CEE claimed that "[t]he protest shows the match of wafer/cell count with no breakage/waste documented." This allegation has no merit[6] because the supporting documents traced a total of 2,888,000 wafers used in production to account for 152,400 solar cells. Since one wafer is needed to manufacture one solar cell, the difference between those two figures is more than sufficient to account for breakage and waste of wafers during the manufacturing process.[7]

c.  The CEE claimed that "a large amount of inventory previously not referenced to complete the modules leading to inconsistencies with documentation and traceability." This allegation is without merit—and is absurd—because Maxeon and the CEE initially determined that Maxeon would trace one Sample Module, but the CEE subsequently requested that Maxeon provide tracing documentation for all 750 Solar Modules, as noted above. No inconsistent records were submitted, but rather, when the scope of the CEE's request changed, additional records were provided relating to the production of the other 749 Solar Modules.

---

[6] Not only is the claim meritless, but the inquiry from the CEE is irrelevant. Broken or unused wafers are, by definition, not inputs in the finished Solar Modules. Furthermore, the CEE's implication that an importer must trace the ultimate destination of components that were used in downstream products other than those in the entry is unreasonable.

[7] Many, but not all, of the excess wafers were used in the production of other Max6 solar modules that were not in the subject entry.

As with the Sample Module, this documentation covered the supply chain from polysilicon to final module. The "large amount of inventory previously not referenced to complete the modules" was simply the inventory for the other 749 Solar Modules that the CEE originally did not want but later explicitly requested.

d.  The CEE claimed that "[t]he SunPower relationship disclosed with the added Swiss supply chain entity at protest changed the corporate structure and supply chain from the previous submission." This allegation is without merit because Maxeon's Protest did not include any previously undisclosed entities or relationships. An ownership chart, which references SunPower Switzerland and its relationship to Maxeon, Parent Company, and other affiliates, was included in the initial documents that Maxeon submitted to the CEE (prior to its Protest). In addition, both the pre-Protest applicability submissions and the Protest included other records (*e.g.*, commercial invoices, packing lists, etc.) identifying SunPower Switzerland in the financial transactions of the supply chain. This entity was not unknown to the CEE or undisclosed by Maxeon, and even if it was originally unknown to the CEE, the CEE plainly came to learn of it before CBP excluded the Solar Modules. Further, the presence of SunPower Switzerland in the chain of financial transactions does not impact the manufacturing supply chain of the Solar Modules.

44. On November 1, 2024, Maxeon and its counsel gave an in-person presentation to the assigned OR&R attorneys regarding the supply chain of the Solar Modules[8] and to

---

[8] The presentation also covered Maxeon's Max3 solar modules, which were also detained pursuant to the UFLPA, excluded by the CEE, and sent to OR&R for further review.

respond to the concerns raised by the CEE in the previous paragraph. Members of the CEE review team were also in attendance virtually.

45. On November 4, 2024, Maxeon submitted a second supplement to the Protest, which was transmitted to both the CEE and OR&R review teams.

46. On November 21, 2024, Maxeon and its counsel met with the assigned OR&R attorneys via video conference. During the meeting, OR&R represented that the intake review of the Protest materials was complete, and the office had four additional questions, which covered the following topics: (1) Maxeon's alternative—also UFLPA-compliant— sources of solar wafers; (2) whether other solar modules were produced in the same SunPower Mexico facility and what internal controls are in place to ensure the Max6 solar cells "are not cross contaminated" with other solar cells[9]; (3) how market conditions impacted module production times; and (4) AUO's polysilicon sources.

47. On December 4, 2024, Maxeon submitted a detailed written response to the questions posed. In the following months, Maxeon repeatedly followed up with OR&R and offered to provide any additional information or explanations that would facilitate its review of the Protest.

48. On March 21, 2025, Maxeon's counsel received an email from a member of the review team at OR&R, which stated that "all Maxeon protests have been returned to the [CEE] for disposition, without the issuance of formal decisions from [OR&R]." Upon consultation with the CEE, Maxeon learned that the protests were returned supposedly

---

[9] As Maxeon explained in its written response to OR&R, cross-contamination is not possible because the solar cells used in different models are physically different sizes and cannot be used in other models. Furthermore, the SunPower Mexico facility has extensive internal controls to ensure proper handling.

18

for failure to meet the criteria for further review enunciated in 19 C.F.R. § 174.24. *See* ECF No. 6-1 at 6.

49. OR&R's decision to decline review is puzzling because Maxeon articulated clear grounds for further review. The Protest involved "questions of law or fact which have not been ruled upon by the Commissioner of CBP or his designee or the Customs court" because the Protest required CBP to determine—for the first time—whether the Solar Modules are UFLPA-compliant and entitled to admission into the United States when there is no evidence that an entity located in Xinjiang or on the UFLPA Entity List was involved in the supply chain. *See* 19 C.F.R. § 174.24(b). Furthermore, it is odd that OR&R found there was no basis for review four months after indicating to Maxeon that it had completed its intake review and had engaged with Maxeon on the facts of the Protest.

50. Shortly thereafter, on March 26, 2025, the CEE denied the Protest, providing the identical explanation given on October 8, 2024, *i.e.*,:

> The additional wafers do not have inventory reports to support the supply chain origination, only unverified screenshots. The protest shows the match of wafer/cell count with no breakage/waste documented; a large amount of inventory previously not referenced to complete the modules leading to inconsistencies with documentation and traceability. The SunPower relationship disclosed with the added Swiss supply chain entity at protest changed the corporate structure and supply chain from the previous submission.

51. Despite Maxeon's consistent, collaborative engagement with the CEE and OR&R, CBP unjustifiably disregarded the voluminous evidence that Maxeon provided and excluded the Solar Modules without ever contending there was a connection between the Solar Modules and an entity located in Xinjiang or named on the UFLPA Entity List.

52. On April 21, 2025, Maxeon filed a Summons to challenge the Protest denial and exclusion of the Solar Modules.

19

**STATEMENT OF CLAIM**

53. The Solar Modules were not made in Xinjiang or by a company on the UFLPA Entity List (or otherwise made with forced labor). Maxeon demonstrated that fact to CBP.

54. In its denial of the Protest and exclusion of the Solar Modules, CBP wrongfully applied the rebuttable presumption under the UFLPA even though it has no relevance in this case.

55. The supply chain of the Solar Modules does not include an entity located in Xinjiang and does not include an entity named on the UFLPA Entity List. As such, the UFLPA does not apply to this entry and the UFLPA's rebuttable presumption does not prohibit, and is not relevant to, entry under 19 U.S.C. § 1307.

56. CBP wrongfully denied the Protest and excluded the Solar Modules from entry.

**PRAYER FOR RELIEF**

WHEREFORE, Maxeon respectfully requests this Court to:

(1)     Enter judgment in Maxeon's favor ordering that the Solar Modules are admissible under the UFLPA and 19 U.S.C. § 1307;

(2)     Enter judgment directing CBP to allow entry of the Solar Modules;

(3)     Enter judgment awarding Maxeon costs and interest, including attorney's fees, as allowed by law; and

(4)     Enter judgment awarding Maxeon such other and further relief as this Court deems just.

July 15, 2025                          Respectfully submitted,


                                       ____/s/ Richard A. Mojica_____
                                       Richard A. Mojica
                                       Adam Feinberg
                                       Brittany Huamani
                                       MILLER & CHEVALIER CHARTERD
                                       900 Sixteenth Street NW
                                       Washington, D.C. 20006
                                       Telephone: (202) 626-5800
                                       Fax: (202) 626-5801
                                       Email: rmojica@milchev.com
                                       Email: afeinberg@milchev.com
                                       Email: bhuamani@milchev.com

                                       *Counsel for Maxeon Americas, Inc.*